IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONNELL SMITH, | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 12-2704-JMC |
| ANTHONY HARRIS, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \*

## **MEMORANDUM AND ORDER**

Plaintiff, Donnell Smith, brought this action against Defendant, Anthony Harris, under 42 U.S.C. § 1983, alleging that Mr. Harris used excessive force in violation of the Eighth Amendment when he punched Mr. Smith in the face while Mr. Smith was handcuffed and restrained.[1]  (Am. Compl., ECF No. 65.)  The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4.  (ECF Nos. 97, 98.)  After a three day jury trial, the jury returned a verdict in favor of Mr. Harris and against Mr. Smith, finding that Mr. Smith did not prove by a preponderance of the evidence that Mr. Harris deprived him of his Eighth Amendment right to be free from cruel and unusual punishment.  (ECF No. 171.)  The Court entered judgment in favor of Mr. Harris.  (ECF No. 177.)  Mr. Smith thereafter timely filed a Motion for a New Trial.  (ECF No. 178).  The motion has been fully briefed (ECF No. 179, 180), and no hearing is necessary, Local Rule 105.6 (D. Md. 2014).  For the reasons that follow, Mr. Smith's Motion for a New Trial is DENIED.

---

[1] All other counts originally brought by Mr. Smith were dismissed in a Memorandum Opinion issued by the Honorable Richard D. Bennett of this Court on June 21, 2013.  (ECF No. 44.)

I.     **Evidence Presented at Trial**

Because Mr. Smith contends that the verdict is against the clear weight of the evidence, the Court will first summarize the evidence presented at trial relevant to the issue on which the jury reached its verdict.

A.     **Testimony of Plaintiff Donnell Smith**

On December 28, 2010, the date of the events that formed the basis of this dispute, Mr. Smith was an inmate at Jessup Correctional Institution ("JCI") where Mr. Harris was employed as a correctional officer. At trial, Mr. Smith testified that he attempted to report late to his job in the dietary unit that morning, and after instructing him that he could not do so, several officers directed him to lock into his cell. (Trial Tr. 41:10-49:2, Feb. 29, 2016, ECF No. 174 ("Day 1 Trial Tr.").) Mr. Smith admitted that he refused the instruction multiple times and also actively resisted efforts by the officers to put his hands behind his back. (*Id.* 49:2-7, 50:6-22.) The officers pepper sprayed Mr. Smith in the face and took him to the ground, and they eventually succeeded in securing his hands behind his back. (*Id.* 51:7-52:8, 56:2-5.) As the officers took Mr. Smith to the ground, an officer issued a "1013 code" over her walkie-talkie, indicating that an officer was in need of assistance, and additional officers (including Mr. Harris) began arriving on the scene. (*Id.* 53:17-22, 55:7-18.) Two officers stood Mr. Smith up once he had been secured, at which point he was attempting to wipe his face on his shirt to get the mace out of his eyes and explaining the altercation to Captain McDonald. (*Id.* 58:15-59:4.) Approximately two minutes after he stood up, Mr. Smith described being hit on the nose by what "felt like a balled up fist and a ring." (*Id.* 59:4-11, 61:4-6.) Mr. Smith could not see who hit him due to the mace in his eyes, and stated that immediately upon being hit he called out, "Why you hit me?" (*Id.* 59:21, 60:1-5, 82:6-9.) Mr. Smith stated that prior to being hit, he was not hitting, kicking, or spitting. (*Id.* 61:14-23.)

2

After the hit, Mr. Smith was in pain and his nose began to bleed, the blood running into his mouth. (*Id.* 59:12-15, 60:22-24.) Mr. Smith heard Captain McDonald, the shift supervisor at JCI, say "Don't hit him again," and "Take him to medical." (*Id.* 82:12-23.) Mr. Smith was then taken to the medical unit where the mace was rinsed out of his eyes and blood was cleaned from his nose and mouth. (*Id.* 94:21-24). The medical report documenting Mr. Smith's treatment that day indicated that Mr. Smith declined ice pack application to the affected area and pain medication, stating that he was "fine." (*Id.* 95:22-23.)

Beginning six months to a year after the altercation, Mr. Smith described experiencing nightmares in which he was beaten by guards. (*Id.* 101:12-103:10.) Mr. Smith also described suffering weight loss, issues with sleeping (requiring sleeping medication), and anxiety around prison officials, for which he received medication and occasional psychiatric treatment. (*Id.* 103:11-105:8.) Mr. Smith testified that he originally believed he was hit by Lieutenant Reginald Oliver, but that at some point in the days after the altercation, he had a discussion with Lieutenant Oliver in which Lieutenant Oliver purportedly informed him that Mr. Harris had hit him. (Trial Tr. 52:2-53:4, Mar. 1, 2016, ECF No. 175 ("Day 2 Trial Tr.").)

B. **Testimony of Defendant, Anthony Harris**

Officer Harris testified that on the morning of December 28, 2010, he was working in the State Use Industries area of JCI when a "signal 13" was called. (Trial Tr. 20:16-17, 22:2-3, Mar. 2, 2016, ECF No. 176 ("Day 3 Trial Tr.").) Mr. Harris explained that a signal 13 means that an officer is in need of assistance, and when that code is called, officers need to get to the scene as soon as possible because the code indicates someone has lost control of the situation. (*Id.* 22:6-10.) Once the situation has been secured, "signal 13 secure" will be called, so that the correctional officers who are in the process of responding can return to their designated work areas. (*Id.* 23:1-6.) When a signal 13 is called, the goal is to secure the scene as soon as

possible, and when the signal 13 goes on for a long period of time, it indicates that the situation is out of control. (*Id.* 22:18-24.) On December 28, 2010, Mr. Harris testified that the signal 13 was continuously called during the time it took him to secure the area where he was working and make his way through multiple gates and onto the tier where Mr. Smith was located—approximately five to ten minutes. (*Id.* 24:8-25:21.) As he entered the tier, Mr. Harris's goal was to make sure everything was secure because "there could be convicts still on the tier," and in light of the number of weapons in the prison, he wanted to prevent "any potential harm to anyone." (*Id.* 26:16-24.)

Upon entering the tier, Mr. Harris smelled mace and observed Mr. Smith and several other officers who appeared to have been in a physical altercation. (*Id.* 27:19-23.) There were 20 or 30 officers surrounding Mr. Smith at that point, and Mr. Harris pushed his way through the other officers to get to Mr. Smith because he was one of the higher ranking officers on the scene. (*Id.* 27:14-16, 43:11-15, 44:20-22.) As he approached, several officers were picking Mr. Smith up from the ground, and he seemed "very agitated" to Mr. Harris. (*Id.* 28:22-23.) Because of the mace, Mr. Smith appeared to be experiencing increased mucus and nasal discharge, consistent with the side effects of mace with which Mr. Harris was familiar. (*Id.* 28:10-17.) Mr. Harris testified that Mr. Smith was "shaking his head," apparently trying to clear his vision, and "yelling out to inmates" to assist him. (*Id.* 28:23-29:2.) As Mr. Smith was yelling and shaking, Mr. Harris stated that Mr. Smith was expelling fluids from his person, and in response, Mr. Harris "spontaneously" extended his arm in an effort to shield himself from Mr. Smith's bodily fluids. (*Id.* 29:18-24.) As he extended his arm, Mr. Harris testified that his hand was not a closed fist, and that he did not feel it make contact with Mr. Smith. (*Id.* 30:24-31:17.) Additionally, Mr. Harris testified that he does not wear rings or any other jewelry because he had

previously lost a ring at JCI. (*Id.* 31:18-32:1.) Mr. Harris recalled being pulled away from Mr. Smith at this point, but he believed another officer was pulling him away to protect him from the bodily fluids Mr. Smith was expelling, for his own safety. (*Id.* 53:19-54:6.) Prior to December 28, 2010, Mr. Harris did not know Mr. Smith, had never met Mr. Smith, had never spoken with Mr. Smith, and knew nothing about him. (*Id.* 32:24-33:11.)

      C.      **Testimony of Correctional Officer Witnesses**

Three correctional officers also offered first-hand accounts of the events of December 28, 2010. First, Captain Reginald Oliver (who was then a lieutenant), testified that he encountered Mr. Smith on that date when he was called to assist other officers due to Mr. Smith's refusal to lock in to his cell. (Day 2 Trial Tr. 65:7-9.) After Mr. Smith refused two orders from Lieutenant Oliver to lock into his cell, Lieutenant Oliver directed a sergeant to handcuff Mr. Smith. (*Id.* 66:6-14.) Mr. Smith resisted the sergeant's attempt to handcuff him, and according to Lieutenant Oliver, yelled out to other inmates in the area to come down to assist him. (*Id.* 66:25-67:2.) Lieutenant Oliver then maced Mr. Smith and ordered the other officers to take him to the ground. (*Id.* 67:2-5.) When asked about the physical reaction mace typically causes, Lieutenant Oliver explained that mace is inhaled when it's sprayed on someone, and it results in swelling of mucus membranes of the eyes, nose, and throat; nasal discharge, burning, and irritation; pain and burning in the eyes; inability to see; and accelerated secretion of saliva. (*Id.* 80:4-17, 81:22.)

Lieutenant Oliver testified that initially, there were three other officers who assisted him in subduing Mr. Smith, but that as they were gaining control of the situation, other officers began arriving on the scene, apparently in response to a 1013 code. (*Id.* 67:10-11, 67:24-68:25.) Lieutenant Oliver explained that a 1013 code was called because Mr. Smith was resisting the officers who were struggling to gain control of him. (*Id.* 69:25-70:6.) Lieutenant Oliver elaborated that a 1013 code means there is a dangerous situation in which a correctional officer

5

might be harmed, so every officer who is available will respond to the code until it has been secured, which often results in a response from a large number of officers. (*Id.* 75:14-77:13.) Lieutenant Oliver clarified that Mr. Harris was not present when Mr. Smith was refusing orders, when he was maced, when he was taken to the ground, nor when the officers were struggling with him on the ground. (*Id.* 78:5-15.)

Once the officers had secured Mr. Smith, Lieutenant Oliver and another officer helped him to stand up so that they could escort him from the area. (*Id.* 71:11-14.) As Lieutenant Oliver stood Mr. Smith up, he was checking Mr. Smith's handcuffs to confirm that they were secure, as he heard Mr. Smith say "why you hit me, Oliver?" (*Id.* 71:17-72:2.) Lieutenant Oliver immediately looked up and saw another officer, Captain Wood, pulling Mr. Harris out of the way. (*Id.* 73:10-11.) Lieutenant Oliver did not see anyone hit or punch Mr. Smith, and he did not know why Captain Wood pulled Mr. Harris away. (*Id.* 73:12-13; 86:10-11, 88:23-24.) He did, however, explain that as the senior ranking officer on the scene, it was Captain Wood's obligation to get to the inmate, and that it was not unusual under those circumstances for Captain Wood to be pulling someone out of the way. (*Id.* 89:6-14.) Subsequently, Lieutenant Oliver observed that Mr. Smith had a bloody nose. (*Id.* 73:23-25.) Lieutenant Oliver did not, however, observe whether Mr. Smith had a bloody nose at the time he was picked up from the ground, and did not know when the bloody nose occurred. (*Id.* 86:2-9.) While Lieutenant Oliver was holding Mr. Smith, he did not feel Mr. Smith rock back when he exclaimed he had been hit, and he did not hear Mr. Smith moan, cry, state he was in pain, or show any indication that he was in pain after the exclamation. (*Id.* 88:1-14.) Lieutenant Oliver confirmed that he had a conversation with Mr. Smith in the days following the incident, but stated that during that

conversation, he never stated to Mr. Smith that Mr. Harris (or anyone else) had hit him. (*Id.* 89:22-90:10.)

Corporal Thaddeus Kennedy next testified that he also encountered Mr. Smith on the morning of December 28, 2010 when, upon responding to an officer needs assistance call, he found Mr. Smith lying on the floor, surrounded by approximately 30 correctional officers. (*Id.* 92:8-93:5.) After arriving on the scene, Corporal Kennedy climbed seven to ten steps up a nearby set of stairs to prevent other inmates from coming down the stairs, and from that vantage point, he was able to see Mr. Smith, who was approximately 15 feet away. (*Id.* 93:13-94:5.) Corporal Kennedy saw multiple officers help Mr. Smith to his feet, at which point Mr. Smith was still being combative and kicking. Approximately 15 seconds later, Corporal Kennedy heard Mr. Smith yell "someone hit me in my face." (*Id.* 94:9-21, 102:5-8.) Before he heard Mr. Smith cry out, Corporal Kennedy stated that he saw a hand move toward Mr. Smith's face, but that it was hard to tell to whom the hand belonged, whether the fist was open or closed, or whether it made contact with Mr. Smith. (*Id.* 95:1-11, 103:3-6.)[2] Corporal Kennedy stated that he saw mace on Mr. Smith's face, but did not see that Mr. Smith was bleeding or otherwise injured. (*Id.* 103:13-19.)

Finally, Captain Craig McDonald testified that on the morning of December 28, 2010, upon responding to an officer needs assistance call, he observed approximately 15 to 20 officers surrounding an inmate who had been lifted off the floor with his hands secured behind him. (*Id.* 107:18-108:18, 109:11-13.) Captain McDonald noticed that the inmate had his face down and

---

[2] Plaintiff's Counsel attempted to impeach Corporal Kennedy with a report he had given a week after the incident in which he stated that he saw an unidentified officer strike Mr. Smith. (Day 2 Trial Tr. 100:10-16.)

was trying to shake what Captain McDonald assumed was pepper spray from his face.[3]  (*Id.* 113:19-23.)  As one of the ranking officers on the scene, Captain McDonald attempted to get to where the inmate was so that he could assess the scene and determine the appropriate course of action.  (*Id.* 108:22-109:5.)  As he approached the inmate, Captain McDonald saw Mr. Harris appear to throw a "punch" at the inmate, whom he subsequently identified as Mr. Smith.  (*Id.* 109:14-110:25.)  Captain McDonald elaborated that he saw Mr. Harris's hand move forward in a manner that he considered consistent with a punch, but that he could not see whether the hand was opened or closed and could not confirm that the hand made contact with Mr. Smith.  (*Id.* 111:23-25, 122:2-15, 127:13-18.)  Captain McDonald then heard Mr. Smith say "Why did you punch me in my face" and saw Captain Wood push Mr. Harris out of the way.  (*Id.* 111:3-9.)  Once he reached Mr. Smith, Captain McDonald and two other officers escorted Mr. Smith from the building and to the medical unit.  (*Id.* 112:12-14.)  Captain McDonald was unable to see Mr. Smith's face clearly before the punch, but after the punch he observed that Mr. Smith had a bloody lip, a bloody nose, and mucus coming out of his mouth and nose.  (*Id.* 112:17-24.)

## II.     Standard of Review

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues – and as to any party – . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59 (a)(1)(A).  Granting a motion for a new trial is "within the sound discretion of the trial court but such discretion must not be arbitrarily exercised."  *City of Richmond v. Atlantic Co.*, 273 F.2d 902, 916 (4th Cir. 1960).  On a Rule 59 motion, the court "must set aside the verdict and grant a new trial" if "(1) the verdict is against the clear weight of the evidence, or (2) is

---

[3] Captain McDonald offered testimony similar to that of Lieutenant Oliver concerning the side effects of mace, including discharge of mucus from the nose and watering eyes. (Day 2 Trial Tr. 116:5-15.)

based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). In determining whether the verdict is against the clear weight of evidence or will result in a miscarriage of justice, the trial judge has a duty to "weigh the evidence and the credibility of the witnesses." *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985) (distinguishing the standard for evaluating a motion for a new trial from the standard for a motion for judgment notwithstanding the verdict), *amended on other grounds*, 788 F.2d 1042 (4th Cir. 1986).

### III. Analysis

Mr. Smith argues that the Court should set aside the verdict and grant a new trial because the verdict is against the clear weight of the evidence and because allegedly prejudicial evidence introduced at trial has resulted in a miscarriage of justice.

#### A. Clear Weight of the Evidence

Mr. Smith first argues that, contrary to the jury's verdict, the clear weight of the evidence proves that Mr. Harris used excessive force against Mr. Smith, depriving him of his Eighth Amendment right to be free from cruel and unusual punishment.[4] The Court does not agree. In order for the jury to have returned a verdict in favor of Mr. Smith, it would have needed to conclude that Mr. Harris inflicted pain on Mr. Smith "unnecessarily and wantonly"; that is, that he applied force "maliciously and sadistically" for the purpose of causing Mr. Smith harm, as opposed to "in a good faith effort to maintain or restore discipline," or even accidentally or non-

---

[4] Mr. Smith also argues that the clear weight of the evidence established that that the excessive force employed by Mr. Harris caused his injuries, which included claims of Post-Traumatic Stress Disorder ("PTSD"). However, the jury reached its verdict on the issue of liability and did not confront the issue of causation, and because, as explained below, that jury's verdict on the issue of liability was not against the clear weight of the evidence, the Court need not consider the issue of causation.

9

purposefully. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The finding involves both a subjective component—that "the prison official acted with a sufficiently culpable state of mind," and an objective component—that "the deprivation suffered or injury inflicted on the inmate was sufficiently serious."[5] *Servidio v. Pittman*, No. 15-7036, 2015 WL 8952827, at *2 (4th Cir. Dec. 16, 2015) (citing *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). To determine whether Mr. Harris's state of mind was sufficiently culpable, the jury was instructed that relevant factors include the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the forceful response. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986). To determine whether the objective component of the inquiry was satisfied, the jury was instructed that the force used need only be "non-trivial." *See Servidio*, at *2 (citing *Wilkins*, 559 U.S. at 39).

As outlined above, the jury was presented with multiple accounts of the interaction between Mr. Smith and Mr. Harris, consisting of both the testimony of the parties, which was self-serving to the extent that is to be expected by parties in any adversarial proceeding, and of three eye-witnesses, whose recollections of the events at issue were at times uncertain and incomplete. After considering that evidence, the Court cannot conclude that the clear weight of the evidence satisfied either component of Mr. Smith's claim so as to displace the jury's conclusion. *See Almendarez v. J.T.T. Enterprises Corp.*, No. 06-cv-68-JKS, 2010 WL 2367219, at *5 (D. Md. June 8, 2010) (denying a motion for a new trial where "the jury was presented with

---

[5] As the Court has previously noted, while the Fourth Circuit's recent decision in *Servidio* is not binding precedent, the fact that it considered separately the subjective and objective components of the inquiry is nevertheless instructive.

conflicting and incomplete evidence, largely the testimony of witnesses whose recollection and credibility were impeached on numerous grounds").

In support of his contention that the clear weight of the evidence established that Mr. Harris applied force maliciously and sadistically for the purpose of causing Mr. Smith harm, Mr. Smith claims there is no evidence corroborating Mr. Harris' explanation of events—that he extended his hand toward Mr. Smith reflexively, rather than intentionally, to block bodily fluids that Mr. Smith was projecting. The Court does not agree. Witnesses who described the effects of mace on a person included potential secretions from the eyes, nose and mouth. Mr. Smith himself did not deny yelling or shaking his head after being maced, and he stated that he was trying to wipe his face on his shirt to get the mace out of his eye when he stood up. In fact, the only aspects of Mr. Smith's account of events that are inconsistent with Mr. Harris's explanation are Mr. Smith's insistence that he was not hitting, kicking, or spitting at the time Mr. Harris allegedly hit him, and his statement that it felt like a closed fist with a ring made contact with his face.[6]

Critically, nothing in the testimony of the correctional officers who witnessed the encounter undermines Mr. Harris's explanation, and several aspects of the officers' testimony are consistent with his description. For example, Lieutenant Oliver did not see whether or not Mr. Harris ever struck Mr. Smith, let alone the nature of that contact (i.e., open or closed hand, incidental contact or intentional punch). (Day 2 Trial Tr. 86:10-11, 92:15-22.) Lieutenant Oliver confirmed that Mr. Smith was initially taken down to the concrete floor "hard and fast" and face first without making any effort to protect Mr. Smith's face, providing some corroboration for Mr.

---

[6] As discussed more fully below, it is far from clear that the objective component to Mr. Smith's claim was satisfied given that no witness other than Mr. Smith testified that Mr. Harris' hand actually touched him, and that the circumstances of the initial "take down" (that did not involve Mr. Harris) were sufficient to account for Mr. Smith's physical injuries.

11

Harris' contention that Mr. Smith received his bloody nose from this initial take-down, not from the later encounter with Mr. Harris. (Day 2 Trial Tr. 82:18-83:9.) In fact, Lieutenant Oliver agreed that Mr. Smith's bloody nose could well have occurred from Mr. Smith's initial struggle with correctional officers. (Day 2 Trial Tr. 88:15-20.) Lieutenant Oliver also was holding Mr. Smith, and testified that he did not feel Mr. Smith rock back, moan, cry or state that he was in pain at any point during or after the encounter with Mr. Harris which one might expect if Mr. Harris indeed threw a closed fist punch at a handcuffed inmate with the intent to cause Mr. Smith harm. (Day 2 Trial Tr. 88:1-14.)

Corporal Kennedy's testimony corroborated Mr. Harris's statement that Mr. Smith was still being combative and kicking after he had been helped to his feet (Day 2 Trial Tr. 94:13-21), and although Corporal Kennedy observed a hand move toward Mr. Smith's face, he could not determine whether it was an open palm or a closed fist (Day 2 Trial Tr. 103:3-6).

Even Captain McDonald, who characterized the contact as a punch, could not definitively say whether Mr. Harris moved his hand toward Mr. Smith with a closed fist or an open palm. (Day 2 Trial Tr. 111:23-25.) Like Lieutenant Oliver, he also could not ascribe Mr. Smith's bloody nose to any action by Mr. Harris as he could not describe Mr. Smith's condition before the encounter with Mr. Harris. (Day 2 Trial Tr. 112:17-18.) This would allow for a juror to conclude that Mr. Smith's physical injuries could well be the result of the initial struggle between Mr. Smith and correctional officers prior to Mr. Harris arriving on the scene rather than a punch by Mr. Harris.

Finally, the testimony was uncontradicted that Mr. Harris had no history with Mr. Smith and had never encountered him prior to the incident in question. Likewise, the evidence established that Mr. Harris was not part of the initial struggle between Mr. Smith and the other

correctional officers or that he even witnessed it. This lack of any obvious motive to want to "maliciously and sadistically" cause Mr. Smith harm also lends support to Mr. Harris' contention that this was, at most, incidental contact.

After weighing the testimony of the parties and the witnesses concerning Mr. Smith's behavior immediately preceding the alleged contact, as well as the details and circumstances of the contact itself, the Court cannot conclude that the clear weight of the evidence establishes that Mr. Harris applied force "maliciously and sadistically" for the purpose of causing Mr. Smith harm. To the contrary, there is ample record evidence supporting Mr. Harris's account of events and indicating that his contact with Mr. Smith (assuming there was some) was merely reflexive to protect himself from Mr. Smith's bodily fluids which were at enhanced levels following the mace, and that the bloody nose resulted from Mr. Smith's initial struggle with correctional officers prior to Mr. Harris' arrival.

### B.    Miscarriage of Justice

Next, Mr. Smith argues that prejudicial evidence was introduced at trial that has resulted in a miscarriage of justice. Specifically, Mr. Smith contends that Defense Counsel repeatedly made statements during trial that implied Mr. Smith had a propensity for violence. These contentions, of course, must be analyzed with recognition that the jury was aware that: (1) Mr. Smith was a convicted felon resident in a maximum security prison at the time of this encounter; and, (2) Mr. Smith himself testified that he initiated the initial struggle with four correctional officers that necessitated an institution-wide call for assistance that drew many more officers—including Mr. Harris—to the scene.

Prior to trial, Mr. Smith had moved *in limine* to limit the information conveyed to the jury regarding the details of his criminal history. While Mr. Smith was willing to allow the jury to learn that he was a convicted felon, Mr. Smith did not want the jury to hear about the underlying

details of his convictions, with included a gun fight with police resulting in an assault conviction, This Court agreed that the particular facts and circumstances surrounding Mr. Smith's underlying convictions could not be introduced due to the danger of unfair prejudice, and the potential to confuse the issues and the risk that the jury might use the particular circumstances of the conviction as *de facto* character evidence. (Voir Dire Tr. 16:11-20:16, Feb. 29, 2016. ECF No. 173.)

Mr. Smith first points to Defense Counsel's opening statement, in which defense counsel stated, in pertinent part, as follows:

> All of these activities took place in the Jessup Correctional Institution or JCI. This is not a boy scouts meeting, this is not a church social, this is a serious place where the worst violent offenders in the state are housed. And I mention that because it is critically important to understand that disobeying an order is an important thing, and it's very important for officers to maintain control in the institution to do what they need to do to maintain control for the safety of the other inmates, the safety of the guards and the safety of the public.

(Day 1 Trial Tr. 19:14-17.)

While there are circumstances where lawyer comments and arguments have served as grounds for a new trial,[7] this is not one. The Court would first point out that there was no objection to the comment (and thus, no opportunity for the Court to simultaneously attempt to cure it) at the time it was made. Notwithstanding the lack of objection, the Court instructed the jury no less than four times that opening statements (and closing arguments) are not evidence. (Day 1 Trial Tr. 7:23-24, 17:19-20; Day 3 Trial Tr. 87:18-20, 92:13-15, 108:17-18.) The Court also instructed the jury both that Mr. Smith's status as a convicted felon was admitted only on

---

[7] *See, e.g., Hillard v. Hargraves*, 197 F.R.D. 358 (N.D. Ill. 2000) (granting a new trial where defense counsel consistently referred to a pro se plaintiff who was merely an arrestee at the time of the conduct in question, as "inmate" or "prisoner," rather than his surname); *but see Pickett v. Detella*, 163 F. Supp. 2d 999, 1006 (N.D. Ill. 2001) (denying new trial where defense comments regarding plaintiff's "long disciplinary history," despite being improper, did not rise to the level of being "clearly injurious" in the context of the case).

the issue of assessing his credibility, and that all persons stand equal before the law.  (Day 3 Trial Tr. 90:12-19, 91:1-8.)

Additionally, the comment made no reference to Mr. Smith specifically or that Mr. Smith himself was among the "worst violent offenders" that are bound to make up at least some of the population of a maximum security prison like JCI.[8]  The comment must also be viewed in the context of the words that immediately follow it, which clarify that in such a setting, discipline and control are imperative for the safety of all (including inmates), as later testimony made clear when the correctional officer witnesses testified regarding their response to Mr. Smith's refusal to lock in to his cell and the subsequent "1013" call that prompted Mr. Harris' ultimate arrival on the scene.

Plaintiff also raises issue with comments during Defense Counsel's opening that Mr. Smith "suffered bad burns in an incident . . . in which he got in a fistfight and had hot liquid thrown on him."  (Day 1 Trial Tr. 29:14-16.)  This matter was not raised *in limine* and no objection was made at the time the comment was made in opening.  The comment was made in the context of Defense Counsel suggesting that any claim by Mr. Smith that the encounter with Mr. Harris caused Post-Traumatic Stress Disorder was undermined by other potential catalysts for traumatic stress, including this "burn" incident.  The Court simply cannot conclude that, viewed in the context of one who admittedly instigated a physical encounter with multiple correctional officers necessitating an institution-wide response (to which Mr. Harris was ultimately summoned) this reference to another incident involving Mr. Smith was so prejudicial as to taint the verdict in this case.

---

[8] In fact, a few minutes later, after detailing Mr. Harris' background, defense counsel commented as to Mr. Smith specifically, "Mr. Smith, I will not get into any detail except to say Mr. Smith was an inmate at JCI. And there is a reason for that, he's a convicted felon." (Day 1 Trial Tr. 21:18-20.)

When Plaintiff's Counsel did later object to Defense Counsel's use of the "burn" incident in questioning witnesses, the Court ruled that Defense Counsel could mention the hot liquid and could refer to the incident as "a disagreement with another inmate that resulted in personal injury to Mr. Smith." (Day 1 Trial Tr. 72:5-9.) The Court explained that the incident was probative of the issues of causation and damages, insofar as it the jury might view the "burn" incident as a more serious incident than the encounter with Mr. Harris, yet one from which Mr. Smith did not claim to suffer PTSD symptoms, potentially undermining Mr. Smith's claim that he suffered PTSD from Mr. Harris's alleged punch. (Day 1 Trial Tr. 69:16-25.) The Court reasoned that discussing the fact of the incident, without delving into the specific circumstances that brought it about, did not run the risk of being particularly prejudicial, given the context of confinement at JCI, where an incident or altercation resulting in an injury to Mr. Smith might reasonably be expected. (Day 1 Trial Tr. 70:17-23.) In questioning Plaintiff's expert on the incident, Defense Counsel adhered to the boundaries of the Court's ruling (Day 2 Trial Tr. 241:22-242:13), and for the reasons previously stated, the Court again concludes that defense counsel's reference to this otherwise relevant evidence was not unduly prejudicial to Mr. Smith.

Mr. Smith also takes issue with the Defense's cross-examination of Mr. Smith in which, after eliciting from Mr. Smith that he is a convicted felon, Defense Counsel proceeded to ask Mr. Smith, "And you have been incarcerated continuously since when?" to which Mr. Smith responded, "Since 2007." (Day 1 Trial Tr. 109:9-10.) Additionally, Mr. Smith points to two references made by Defense Counsel in questioning other witnesses that Mr. Smith has been incarcerated for approximately one third of his life. (Day 2 Trial Tr. 37:1-3, 242:25.) Mr. Smith argues that Defense Counsel's choice of "verb tense, mood, and aspect" in asking these questions and making these statements indicated to the jury that Mr. Smith was still incarcerated as of the

trial in this case, and that he had committed a serious enough crime to warrant at least nine years in prison. Mr. Smith claims these statements were highly prejudicial and violated the Court's ruling *in limine* excluding evidence of the circumstances of Mr. Smith's prior convictions. (Voir Dire Tr. 16:11-20:16.)

The Court cannot conclude that Mr. Smith suffered any prejudice from Defense Counsel's statements pertaining to the length of Mr. Smith's incarceration. The only prejudice Mr. Smith has articulated is that the length of his sentence demonstrates the severity of his crimes. However, the Court notes that lengthy sentences may be imposed for both violent and non-violent crimes, such that the length of Mr. Smith's incarceration offered the jury no specific information regarding the specific circumstances of Mr. Smith's crimes or that they were necessarily crimes of violence. Defense Counsel's statements thus did not violate the Court's ruling *in limine*. Moreover, Mr. Smith stipulated to being a convicted felon, which indicated to the jury with equal force that Mr. Smith had committed a "serious" crime. As Mr. Harris notes, the jury also could easily have estimated the length of Mr. Smith's incarceration based on his testimony on direct examination, such that Defense Counsel's mention of the length of Mr. Smith's incarceration and the fact that it equated approximately one third of his life did not impart any new information to the jury. The Court thus cannot conclude that Defense Counsel's statements pertaining to the length of Mr. Smith's sentence were prejudicial to Mr. Smith.

Finally, even viewing Defense Counsel's allegedly improper questions and statements cumulatively, the Court cannot conclude that the remarks were unduly prejudicial. Where an inmate in a maximum-security prison alleges that his Eighth Amendment rights have been violated due to excessive force by a correctional officer, and that he suffers from PTSD as a result, he cannot expect to pursue his claim without the fact of his incarceration coming to the

jury's attention.  Nor can he expect to pursue claimed damages for PTSD without the Defense being able to pursue the theory that other traumatic events caused his injuries.  The facts explored by Defense Counsel were unquestionably relevant to the jury's consideration of the issues, and the Court limited the prejudicial effect of those facts to the greatest extent possible.  Accordingly, the Court cannot conclude that the jury's verdict resulted in a miscarriage of justice.

**IV.**     **Conclusion**

For the foregoing reasons, Mr. Smith's Motion for a New Trial (ECF No. 178) is DENIED.

Dated:  June 30, 2016                                             /s/                         
                                                        J. Mark Coulson
                                                        United States Magistrate Judge